## Commonwealth v. DeVoute

*Bert Goodman*, for plaintiff.
*Arthur King*, for defendant.

LOWE, *P.J.*, January 10, 1978—On June 28, 1977, Trooper Chester G. Corrigan of the Pennsylvania State Police observed a green Lincoln Continental automobile, displaying an expired Pennsylvania registration, traveling in the eastbound curb lane of I-76 between Gladwyne and City Line Avenue, this county. Trooper Corrigan stopped the vehicle and cited defendant John DeVoute for displaying an expired registration in violation of The Vehicle Code of April 29, 1959, P.L. 58, as amended, 75 P.S. §511(b). It had expired March 31, 1977. Mr. DeVoute was the operator and registered owner of the vehicle.

Mr. DeVoute stated both at the time of arrest and at trial that the Pennsylvania Bureau of Motor Vehicles failed to issue his registration upon request. He acknowledged he was unwilling to comply with registration requirements in that he had no automobile insurance. He stated that compulsory

insurance was contrary to his religious convictions. Mr. DeVoute is a member of Father Divine's Church. One of the tenets of his persuasion is that members are not permitted to obtain insurance of any nature. Section 13 of the church discipline, constitution and by-laws, provides: "Members of this church will not take out life insurance, accident insurance, workmen's compensation liability insurance, fire insurance, plate glass insurance or any other kind of insurance for protection against disasters and other hazards." This article of faith is premised upon the proposition that one must place his trust in God, and not in insurance.

The only issue on appeal is whether the requirement of compulsory automobile insurance is a violation of First Amendment guarantees of the Constitution of the United States.[1] The Constitution, through the First and Fourteenth Amendments, assures freedom to exercise one's chosen religious convictions, but the free exercise of religion is not absolute: Cantwell v. Connecticut, 310 U.S. 296 (1940). Justice Roberts, writing for the majority, observed: "Even the exercise of religion may be at some slight inconvenience in order that the State may protect its citizens from injury." Id., 306. Freedom to believe is protected absolutely, but freedom to act, even when the action is premised upon one's religious convictions, is not entirely free of restriction: Reynolds v. United States, 98 U.S. 145 (1878). In that case the Mormon's exercise of his religious obligation to practice polygamy was held to be outside protected parameters. The Supreme Court of the United States articulated the

---

1. Defendant neither relies upon nor cites article 1, §3 of the Constitution of the Commonwealth of Pennsylvania. It is not here considered.

dilemma between an individual's free religious exercises and conflicting societal interests:

"Can a man excuse his practices to the contrary [of society] because of his religious belief? To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself. Government could exist only in name under such circumstances." Id., 166-167.

The Supreme Court of the United States has upheld governmental regulation of overt religious acts. In Braunfeld v. Brown, 366 U.S. 599 (1961), a Sunday closing law was upheld even though it imposed an economic burden on Orthodox Jewish merchants whose religious beliefs required that the shop also be closed on Saturday, their sabbath. The legislature can create an indirect burden on religious practice provided it does not interfere with convictions or beliefs.

"Courts, no more than Constitutions, can intrude into the consciences of men or compel them to believe contrary to their faith or think contrary to their convictions; but courts are competent to adjudge the acts men do under color of a constitutional right, such as that of freedom of speech or of the press or the free exercise of religion, and to determine whether the claimed right is limited by other recognized powers, equally precious to mankind. So the mind and spirit of man remain forever free, while his actions rest subject to necessary accommodation to the competing needs of his fellows." Jones v. Opelika, 316 U.S. 584, 593-594 (1942).

Laws restricting religious activities that have a potential of harm to the safety, morals, health or general welfare of the community are not repugnant to constitutional guarantees of religious free-

dom. Compelling state interests justify governmental intervention as the following cases demonstrate: (1) The handling of poisonous snakes during a religious worship service is prohibited: Hill v. State, 38 Ala. A. 404, 88 So. 2d 880 (Ala. Ct. App. 1956), cert. denied, 264 Ala. 697, 88 So. 2d 887 (Ala. 1956); Lawson v. Commonwealth, 291 Ky. 437, 164 S.W. 2d 972 (1942); (2) Use of children under the age of twelve to sell any materials, even religious items, held to be a violation of child labor laws with no First Amendment privilege: Prince v. Massachusetts, 321 U.S. 158 (1944); (3) State permitted to enforce compulsory vaccination for contagious disease over religious objection: Board of Education of Mountain Lakes v. Maas, 56 N.J. Super. 245, 152 A. 2d 394 (1959); (4) Court may order blood transfusions to be administered over the religious objections of a Jehovah's Witness: John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A. 2d 670 (1971); State v. Perricone, 37 N.J. 463, 181 A. 2d 751 (1962), cert. denied 371 U.S. 890 (1962); (5) With a single exception, the use of illegal drugs held not protected by the Fifth Amendment. The possession of marijuana to be used for religious illumination as part of Hindu sect is prohibited: Leary v. United States, 383 F. 2d 851 (5th Cir. 1967), rev'd on other grounds, 395 U.S. 6 (1969). The possession of marijuana and LSD for use as a member of the Neo-American Church impermissible: United States v. Kuch, 288 F. Supp. 439 (D.D.C. 1968). Possession of marijuana and peyote for practice of Peyotism not protected: State v. Bullard, 267 N.C. 599, 148 S.E. 2d 565 (1966), cert. denied, 386 U.S. 917 (1967). Contra, the Supreme Court of California held that the sacramental use of peyote by Navajo Indians as part of a religious worship service of the Native American

Church protected. The use of the drug was confined to adults at the religious service and there was no showing of addiction: People v. Woody, 61 Cal. 2d 716, 394 P. 2d 813, 40 Cal. Rptr. 69 (1964).

The Supreme Court of the United States has articulated the standards by which courts must adjudicate conflicts between constitutional guarantees and other societal interests: Sherbert v. Verner, 374 U.S. 398 (1963). In that case a member of the Seventh-day Adventist Church was discharged by her employer for failure to work on Saturday, the sabbath of her faith. The court upheld the claimant's appeal and found no compelling state interest justifying the infringement of her religious beliefs. Plaintiff's First Amendment claim preponderated over any interest the state had in abridging her freedom. Sherbert identifies a three step analysis in evaluating the conflicting interests: (1) sincerity of the claimant's religious belief; (2) nature of the religious exercise and its centralness to the dogma of the religion; and (3) compelling state interest justifying the infringement.

Similarly, in Wisconsin v. Yoder, 406 U.S. 205 (1972), the Supreme Court of the United States applied this balancing test and analysis to the prevailing contention of the Old Order Amish and Conservative Amish Mennonite Churches that their children should not be obliged to attend public or private school beyond the eighth grade notwithstanding a compulsory school attendance law to the contrary. Observed Chief Justice Burger in speaking for the court at page 214: " . . . in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its re-

quirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause."

The practice of members of Father Divine's Church abjuring the purchase of automobile insurance is outside the guarantees of the First Amendment. Application of the Sherbert analysis is illuminating and confirms this conclusion.

Mr. DeVoute testified that his religion does not permit the acquisition of any type of insurance. Such a purchase violates the members' convictions by placing faith and trust in insurance. The first requirement of Sherbert is met. There is a basis in religious doctrine for this practice. The second prong of Sherbert, i.e., whether the belief is central to the religion, is a question better left to theologians! The last requirement is a compelling state interest in compulsory insurance, justifying a limitation on the free and unfettered exercise of religion.

The stated purposes of the No-fault Motor Vehicle Insurance Act of July 19, 1974, P.L. 489, 40 P.S. §1009.101, are: ". . . to establish at reasonable cost to the purchaser of insurance a Statewide system of prompt and adequate basic loss benefits for motor vehicle accident victims and the survivors of deceased victims." 40 P.S. §1009.102(b). The act is designed to compensate motor vehicle accident victims for economic loss, and to encourage prompt payments of such benefits.[2] The benefit is paid re-

---

2. Compulsory automobile insurance has gained nationwide attention. Twenty-four states and Puerto Rico have adopted "no fault" legislation in varying degrees: Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Kansas, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, North Dakota, Oregon, Pennsylvania, Puerto Rico, South Carolina, South Dakota, Texas, Utah, and Virginia.

gardless of fault through a compulsory first party insurance system in which the accident victim's insurance company pays the economic loss directly: 40 P.S. §1009.204(a).

All presumptions are in favor of the validity of legislative enactments, except where the enactment is vague and indefinite: Sun Oil Co. v. Zoning Board of Adjustment, 403 Pa. 409, 169 A. 2d 294 (1961), and provided they have a rational basis: McGowan v. Maryland, 366 U.S. 420 (1961). The instant statute bears a rational relationship to the legitimate legislative objectives and concerns of, for example, relieving court congestion, addressing the escalating cost of automobile insurance, correcting other inequities of the established reparations system, and eliminating minor claims for damages for pain and suffering. The goal of providing a comprehensive automobile accident compensation system in Pennsylvania is a valid exercise of the state's police power. The mandatory insurance requirements are a reasonable and necessary means of providing such protection for Pennsylvania residents who are injured on the streets and highways of this Commonwealth.[3] This compelling state interest justifies a de minimus infraction of Mr. DeVoute's religious practices. Religious convictions remain unchallenged; it is their practice which is impeded. He may not drive an automobile without proper registration. The restriction imposed here is an indirect burden on religious freedom akin Braunfeld.

---

3. In 1976, there were 9,124,915 registered vehicles and 7,342,362 registered operators in the Commonwealth. The 1970 census figure demonstrates that Pennsylvania has a population of 11,793,909. The estimated July, 1976 population figure for Pennsylvania is 11,862,000.

Defendant was properly convicted; his constitutional rights under the First and Fourteenth Amendments to the United States Constitution were not violated.