**Al BERNOTAS, Walter Ward, and Guishu Fang, Appellants**

v.

**ZONING HEARING BOARD OF the CITY OF BETHLEHEM and Ghassan G. Elias, d/b/a Elias Market.**

Commonwealth Court of Pennsylvania.

Argued March 11, 2013.

Decided June 7, 2013.

Reargument Denied July 29, 2013.

---

David M. Backenstoe, Hellertown, for appellants.

Joseph J. Piperato, III, Bethlehem, for appellees Ghassan G. Elias and Elias Market.

Mickey K. Thompson, Whitehall, for appellee Zoning Hearing Board of the City of Bethlehem.

BEFORE: LEADBETTER, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge.

OPINION BY Judge LEADBETTER.

Al Bernotas, Walter Ward, and Guishu Fang (Objectors) appeal from the orders of the Court of Common Pleas of Northampton County (trial court) that affirmed the decisions of the Zoning Hearing Board of the City of Bethlehem (Board) granting Ghassan G. Elias (Applicant), d/b/a Elias Market, variances and a special exception to allow an expansion of the nonconforming use of his property. The Objectors question whether Applicant established entitlement to the requested expansion of the nonconforming use. We affirm.

## I.

Applicant is the co-owner of a 1.82–acre lot located at the intersection of Johnston Drive and State Route (S.R.) 191 (Linden Street) in the City of Bethlehem (City). S.R. 191 is a busy arterial street separating the medium density residential zoning district to the east and the R–R Rural Residential zoning district to the west where Applicant's lot is located. The original structure on the lot was constructed in 1870. There are currently three buildings

on the lot: a main building consisting of 11,067 square feet, and two outbuildings consisting of 2217 and 1152 square feet. The outbuildings are located 10 to 12 feet north of the main building. The larger outbuilding recently sustained fire damages and has been condemned and scheduled to be demolished. There are 85 parking spaces on the lot. The main building is accessed from Johnston Drive and S.R. 191, and the outbuildings have a separate access from S.R. 191 through a loop road. There are single-family dwellings on the west and north of the lot, apartment buildings on the east across S.R. 191, and a church and a vacant lot on the south across Johnston Drive.

Applicant purchased the subject property in 2006 and has operated a farmers' market/grocery store, known as Elias Market, in the main building. Although the record is unclear when such use was established on the lot, it is undisputed that Elias Market is a preexisting nonconforming use under The Zoning Ordinance of the City of Bethlehem (Ordinance), enacted to be effective September 25, 1970 and amended in March 2008.[1] Article 1323, Section 1323.03 of the Ordinance provides that "[t]he lawful use of any building, any structure or the lawful use of any land existing at the effective date of this Ordinance may be continued although such use does not conform with the provisions of this Ordinance except as otherwise provided in this Article."

Prior to Applicant's purchase, the former owners expanded the nonconforming use on the lot by 50% after obtaining special exceptions pursuant to Section 1323.04 of the Ordinance, which provides in relevant part:

A lawful nonconforming use or structure shall only be expanded if the following requirements are met:

(a) The total building floor area or total land area occupied by the nonconforming use or structure, whichever is more restrictive, *shall not be increased by greater than 50 percent beyond the area that existed at the time the use or structure first became nonconforming.*

(1) The 50 percent maximum shall be measured in aggregate over the entire life of the nonconformity. Therefore, for example, if a use became nonconforming in 1971, and was expanded by 20 percent in 1980, then one 30 percent expansion would be permitted today.

(2) These provisions apply regardless of whether the use or structure is expanding within an existing building or an addition.

(b) *Special exception approval shall be required,* except that a one-time expansion of up to 5 percent of the nonconforming first floor building footprint in existence as of the adoption date of this [O]rdinance shall be permitted by right.

(c) Any expansion of a nonconforming use or structure shall meet all required setbacks and all other requirements of this Ordinance. No new nonconformity shall be created. [Emphasis added.]

In July 2009, Applicant appealed the zoning officer's denial of his zoning permit application to the Board and sought a variance from Section 1323.04(a) of the Ordinance. He proposed to construct an enclosed loading dock, an enclosed ramp and a warehouse on the lot, which would increase the existing nonconforming use by another 50% from 14,436 to 19,279 square

---

**1.** Article 1323, Section 1323.02(b) of the Ordinance defines a nonconforming use as "[a] use of a building or lot that does not conform to a use regulation prescribed by this Ordi-nance for the district in which it is located, but which was in existence at the effective date of this Ordinance and was lawful at the time it was established."

feet. Because the proposed construction would increase the total building coverage on the lot to 24.32%, Elias also requested a variance from the 15% maximum building coverage for the R–R zoning district where his property is located.

Before the Board, Stephen Pany, Applicant's engineer who prepared the proposed plan, testified as follows. The subject lot slopes downward from west to east with the floor of the main building a few feet higher than S.R. 191, and the area of the outbuildings 4 to 6 feet higher than the floor of the main building. The current loading dock located between the main building and the western outbuilding is very short, narrow and three and one-half feet deep, and does not drain. It "acts like a big sump to catch water" and accumulates ice in winter. August 26, 2009 Hearing, Notes of Testimony (N.T.) at 33; Reproduced Record (R.R.) at 46a. Due to the unsafe condition, Elias Market's employees are prohibited from using the loading dock and must unload tractor trailers on the parking lot and use handcarts to bring produce to the store.

Under the proposed plan, an enclosed loading dock and an enclosed 80–foot ramp will be constructed on the northwest corner of the lot, and a 20–foot high warehouse will be constructed mainly on the footprint of the outbuildings. The floor of the loading dock will be raised three and one-half feet above the floor of the main building. Pany testified that the proposed location of the loading dock is the only location on the lot where tractor trailers can be maneuvered to a docking position. The warehouse will occupy approximately one third of the proposed 4843–square–foot expansion, and the enclosed dock and ramp will occupy another one third of the expansion. The remaining expansion will be used as a transition area between the warehouse and the main building. Pany

stated that the proposed warehouse would replace the dilapidated outbuildings with a new, clean, modern and functional structure and would reduce the number of deliveries made to Elias Market. The trash receptacles currently located at the north end of the parking lot, 50 feet from the property line, will be relocated to the west end of the main building, 150 feet from the property line, and will be enclosed with a fence. The existing access to the lot from S.R. 191 will be eliminated. The proposed expansion complies with all the setback requirements.

George Azar, the co-owner of Elias Market, testified that Elias Market was required to store goods at its facility in Allentown due to a lack of storage space and that they were transported daily to Elias Market by a truck. Azar further testified that forklifts could not be used in the main building because of its low ceilings and that the proposed expansion would provide employees with a safer, cleaner and more spacious workplace without increasing the store area.

The Objectors, who own adjacent residential properties, testified expressing their concerns over Elias Market's handling of dumpsters, its loading and unloading of tractor trailers, a trailer parked on the sidewalk, and noises from garbage collections in early morning hours.

The Board granted the requested variances at the conclusion of the hearing and subsequently issued a written decision. The Board first noted the relaxed standard applicable to a dimensional variance. The Board concluded that Elias established unnecessary hardship resulting from the unique conditions of the property. The Board found that Applicant's lot is a corner lot and suffered from "severe elevation changes due mainly to the excavation of Route 191." Board's October 7, 2009 Decision at 13; R.R. at 192a. The Board fur-

ther found that the existing loading dock was narrow, steep, insufficient and unusable in the inclement weather; there was no room in the main building for use of forklifts; the proposed loading dock and ramp would enhance the employees' safety and provide tractor trailers with better access to Elias Market; the proposed warehouse would provide Elias Market with more storage space without increasing the size of the store; the expansion would not adversely impact the neighborhood; and, the proposed structures would reduce "eye pollution," noises and the number of deliveries made to the store and eliminate an access to the lot from S.R. 191. *Id.* The Board imposed five conditions to the grant of variances. It directed Applicant to provide additional buffering and landscaping along the western property line, not to change the operating hours, not to expand the retail space and the warehouse, and to have trash picked up after 8:00 a.m. The Objectors appealed the Board's decision, and the City Council intervened in the appeal.

The trial court affirmed the grant of variances. The court concluded that the dimensional variance standard applied to Applicant's application and that Applicant met all the criteria required for the requested variances under Section 910.2(a) of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 805, *as amended,* added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2(a), and Section 1325.06(c) of the Ordinance. The court then questioned whether Section 1323.04(b) of the Ordinance required Applicant to obtain a special exception, in addition to the granted variances, to expand the nonconforming use by 100%. The court stated that "[w]e

can find no legal basis upon which granting a dimensional variance from the percentage limitation on the expansion of nonconforming uses would excuse an applicant from obtaining special exception approval." Trial Court's September 30, 2010 Opinion at 43. The court remanded for the Board's determination of "the applicability of Section 1323.04(b)" of the Ordinance to Applicant's proposed expansion. Trial Court's September 30, 2010 Order.

■ After remand hearings held on November 10 and 29, 2010, the Board granted Applicant a special exception. The Board incorporated the conditions imposed in granting the variances and imposed five additional conditions to address the Objectors' concerns: the warehouse may not be used for wholesale distributions; trucks or buses not owned by Elias Market may not be stored on the lot; there should be no idling of vehicles on the lot; refrigerated trucks should be permitted on the lot only for immediate deliveries; and, all building mechanicals, such as a cooling system, should be placed close to S.R. 191. The Objectors appealed the grant of special exception. Because the stenographer thereafter lost the transcript of the November 10, 2010 hearing, the Board held another hearing to take evidence presented at that hearing pursuant to the trial court's order. After a rehearing, the Board granted Applicant a special exception, and the trial court affirmed. The Objectors' appeal to this Court followed.[2]

## II.

■ One seeking a variance must establish that the zoning ordinance imposes unnecessary hardship resulting from unique

---

**2.** Where, as here, the trial court did not take any additional evidence, this Court's review is limited to determining whether the zoning hearing board committed an error of law or found facts not supported by substantial evidence. *McGonigle v. Lower Heidelberg Twp. Zoning Hearing Bd.,* 858 A.2d 663 (Pa. Cmwlth.2004).

physical conditions of the property; a variance is necessary to enable a reasonable use of the property; the asserted hardship was not self-inflicted; a grant of variance will not alter the essential character of the neighborhood, substantially impair appropriate use or development of adjacent properties, or be detrimental to the public welfare; and, the requested variance represents a minimum variance and a least possible modification of the regulation that will afford relief. Section 910.2(a) of the MPC; Section 1325.06(c) of the Ordinance. The applicant's burden is heavy one, and a variance should be granted sparingly and only under exceptional circumstances. *Teazers, Inc. v. Zoning Bd. of Adjustment of Phila.*, 682 A.2d 856 (Pa.Cmwlth.1996).

 In general, an applicant can establish unnecessary hardship required for a variance by demonstrating either that physical characteristics of the property are such that the property cannot be used for the permitted purpose or can only be conformed to such purpose at a prohibitive expense, or that the property has either no value or only a distress value for any permitted purpose. *Allegheny W. Civic Council, Inc. v. Zoning Bd. of Adjustment of Pittsburgh*, 547 Pa. 163, 689 A.2d 225 (1997); *Mitchell v. Zoning Hearing Bd. of Mount Penn*, 838 A.2d 819 (Pa.Cmwlth. 2003). In *Hertzberg v. Zoning Board of Adjustment of Pittsburgh*, 554 Pa. 249, 257, 721 A.2d 43, 47 (1998), the Court adopted a more relaxed standard for a dimensional variance in which "the owner is asking only for a reasonable adjustment of the zoning regulations in order to utilize the property in a manner consistent with the applicable regulations." In consider-

ing a dimensional variance request, multiple factors may be considered, "including the economic detriment to the applicant if the variance was denied, the financial hardship created by any work necessary to bring the building into strict compliance with the zoning requirements and the characteristics of the surrounding neighborhood." *Id.* at 264, 721 A.2d at 50.[3]

 The Objectors do not dispute that the relaxed dimensional variance standard applies to the requested variance from the 15% maximum building coverage. The Objectors argue, however, that the Board should have applied the use variance standard to the requested variance from Section 1323.04(a) of the Ordinance limiting an expansion of nonconforming use by up to 50%.

This Court previously observed that the proposed expansions of nonconforming uses "may encounter *dimensional* restrictions ... which limit the expansion of such uses by specified percentage limitations." *Jenkintown Towing Serv. v. Zoning Hearing Bd. of Upper Moreland Twp.*, 67 Pa. Cmwlth. 183, 446 A.2d 716, 719 (1982) (emphasis added). The definition of "dimension" includes "magnitude," "size," "extent" and "scope." Webster's Third New International Dictionary 634 (2002). The proposed loading dock, ramp and warehouse will increase the size, extent and scope of the nonconforming use but will not create a new principle use on the lot. Those structures are incidental and secondary to the principle nonconforming use of the property as a farmers' market/grocery store and constitute accessory structures.[4] They will improve and modernize

3. In *Mitchell,* this Court rejected the argument that the dimensional variance standard applied only to a permitted use in a blighted urban area, as in *Hertzberg.*

4. Section 1302.02 of the Ordinance defines an "accessory building or use" as "[a] subordinate use or building customarily incidental to and located on the same lot occupied by the main use or building." *See also Upper Saucon Twp. v. Zoning Hearing Bd. of Upper*

the existing structures devoted to the non-conforming use and provide needed storage spaces for that use. As the Supreme Court held in *Firth v. Scherzberg*, 366 Pa. 443, 449, 77 A.2d 443, 446 (1951), "[n]either the natural growth of a business . . . nor the adoption . . . of more modern instrumentalities, suitable and helpful in carrying on the business, works *a change in use* in legal contemplation." (Emphasis added.) Because the proposal will only increase the nonconforming use without creating a new use on the lot, the requested variances must be evaluated under a dimensional variance standard.[5]

### III.

 The Objectors next argue that Applicant failed to meet the criteria required for granting a variance. An applicant seeking a variance to expand a nonconforming use must still establish unnecessary hardship resulting from unique physical conditions of the property and satisfy all the other criteria in Section 910.2(a) of the MPC and Section 1325.06(c) of the Ordinance. *Domeisen v. Zoning Hearing Bd. of O'Hara Twp.*, 814 A.2d 851 (Pa. Cmwlth.2003).[6]

 The evidence in the record supports the Board's finding that the asserted hardship resulted from the unique physical conditions of the property. Applicant's lot is a corner lot with no possibility to expand the nonconforming use onto other lots, abuts the busy highway and is burdened with the elevation changes that create an unsafe condition of the existing loading dock and ramp. Contrary to the Objectors' contention, Applicant's knowledge of the Ordinance's restrictions on expansion of the nonconforming use when he purchased the property alone, even if proven, does not render the hardship self-inflicted. The hardship is deemed self-inflicted only when the purchaser paid an unduly high price in anticipation of obtaining a variance, or where the transaction itself affected the size and shape of the parcel. *Solebury Twp. v. Solebury Twp. Zoning Hearing Bd.*, 914 A.2d 972 (Pa. Cmwlth.2007). The record in this matter fails to reveal such evidence.

 Applicant also established that the requested expansion of the nonconforming use was necessary for a reasonable use of the property. The co-owner of the property, Azar, testified regarding the unsafe conditions of the existing loading dock and ramp, Elias Market's needs for more work and storage space, and the employees' inability to use forklifts. He stated: "We're basically working two or three times what we should be doing. We're working like

---

*Saucon Twp.*, 136 Pa.Cmwlth. 370, 583 A.2d 45 (1990) (defining an accessory use as a use which is secondary to a principal use and is usually found with the principal use).

**5.** Our conclusion is consistent with the previous holdings that the dimensional variance standard applied to the application to deviate from the required minimum number of parking spaces which are also usually found with principle uses. *See, e.g., Hertzberg; Mitchell; Vitti v. Zoning Bd. of Adjustment of Pittsburgh*, 710 A.2d 653 (Pa.Cmwlth.1998); *Wagner v. City of Erie Zoning Hearing Bd.*, 675 A.2d 791 (Pa.Cmwlth.1996).

**6.** The Board concluded that some criteria for granting variances, including whether the asserted hardship was not self-inflicted, were either met or inapplicable to this matter, without making further findings. Because the record establishes that Applicant met all the criteria for granting the requested variances, it is unnecessary to remand for further findings. *See 41 Valley Assocs. v. Bd. of Supervisors of London Grove Twp.*, 882 A.2d 5 (Pa.Cmwlth.2005), *appeal granted*, 587 Pa. 717, 898 A.2d 1073 (2006) (holding that where, as here, an issue may be resolved based on the record, a remand is unnecessary).

it's 1950." August 26, 2009 Hearing, N.T. at 91; R.R. at 104a. The Board found:

> The Applicant testified that in its present condition, the market cannot maintain sound business practices because it does not have the room to provide for the safety of its employees. The employees cannot carry produce out with forklifts or other large machines, but use hand carts. These employees need to traverse steep docks that become wet as there is no overhead coverage between the outbuildings and the main market. There is literally no room for the employees to break down pallets, cardboard boxes, trash, etc. The warehouse will allow for safe practices by use of forklifts and other machinery in the operation of the market.

Board's October 7, 2009 Decision at 12; R.R. at 191a.

▮▮▮ The property owner has the vested constitutional right to a natural expansion of a nonconforming use. *Silver v. Zoning Bd. of Adjustment,* 435 Pa. 99, 255 A.2d 506 (1969). As the Supreme Court explained, "[a]n ordinance which would allow the housing of a baby elephant cannot evict the animal when it has grown up, since it is generally known that a baby elephant eventually becomes a big elephant." *Upper Darby Twp. Appeal,* 391 Pa. 347, 354, 138 A.2d 99, 102 (1958). Under the doctrine of natural expansion, "a nonconforming use may be extended in scope, as the business increases in magnitude, over ground occupied by the owner for the business at the time of the enactment of the zoning ordinance." *Peirce Appeal,* 384 Pa. 100, 105, 119 A.2d 506, 509 (1956). The municipality may impose reasonable restrictions on the extension of a nonconforming use. *Appeal of Lester M. Prange, Inc.,* 166 Pa.Cmwlth. 626, 647 A.2d 279 (1994). However, "an overly technical assessment of [a nonconforming] use cannot be utilized to stunt its natural development and growth." *Twp. of Chartiers v. William H. Martin, Inc.,* 518 Pa. 181, 188, 542 A.2d 985, 988 (1988).

▮▮▮ In deciding a request to expand a nonconforming use, the owner's rights to make a reasonable use of the property and accommodate business needs must be balanced against the impacts of the proposed expansion on the surrounding area and public interest. *W. Cent. Germantown Neighbors v. Zoning Bd. of Adjustment of Phila.,* 827 A.2d 1283 (Pa. Cmwlth.2003); *Domeisen.* A nonconforming commercial or industrial use "is permitted to expand because expansion or modernization to meet new needs is an essential part of most commercial or industrial uses." *Miller & Son Paving, Inc. v. Wrightstown Twp.,* 499 Pa. 80, 91, 451 A.2d 1002, 1007 (1982) [quoting Robert S. Ryan, Pennsylvania Zoning Law and Practice § 7.7.2 (1970)]. It is not "essential" that the owner of the nonconforming use "should have utilized the entire tract upon which the business was being conducted" at the time of the zoning ordinance enactment. *Peirce Appeal,* 384 Pa. at 105, 119 A.2d at 509.

In *Gilfillan's Permit,* 291 Pa. 358, 140 A. 136 (1927), the owner of a retail lumber business that existed as a lawful nonconforming use in the residential zoning district sought a permit to erect a cement block warehouse for use in connection with the nonconforming use. The city refused to issue a permit, which was ultimately reversed by the zoning board of appeals. The Supreme Court upheld the board's decision, concluding that the zoning board initially "should have allowed an exception to the strict provisions of the ordinance and granted a permit for the additional structures to take care of the expansion of the petitioner's business." *Id.* at 363, 140 A. at 138. The Court stated:

Petitioner's business had been established at its present location long before the passing of the zoning ordinance and was actively conducted at the time the ordinance went into effect; accordingly, as the property was then used for lawful purposes, *the city was without power to compel a change in the nature of the use, or prevent the owner from making such necessary additions to the existing structure as were needed to provide for its natural expansion and the accommodation of increased trade, so long as such additions would not be detrimental to the public welfare, safety and health.* *Id.* at 362, 140 A. at 137–38 (emphasis added).

The record in this matter is replete with the evidence of Elias Market's needs for more work and storage space. The Board found that the existing loading dock and ramp were inefficient and unsafe. As in *Gilfillan's Permit,* the proposed addition of a warehouse and replacement of the existing loading dock and ramp with new structures are necessary to improve and modernize the nonconforming use and to allow Applicant's reasonable use of the property.

■ The record also established that the proposed expansion would not adversely impact the neighborhood. The nonconforming use existed on the lot before the enactment of the Ordinance and before the establishment of the adjacent residential dwellings. Elias Market is not proposing to increase the size of the store to attract more customers. The proposed expansion will enable Elias Market to buy goods in bulk, thereby reducing the number of deliveries made to the store, and will no longer need to store goods at its Allentown facility and transport them daily to Elias Market. In addition, the access to the lot from S.R. 191 will be eliminated. The trash receptacles will be relocated farther away from the neighboring properties and placed in an enclosed area. As the Board found, the proposed expansion "will actually reduce the intensity of the premises." Board's October 7, 2009 Decision at 13; R.R. at 192a. In addition, the numerous conditions imposed by the Board addressed the Objectors' concerns over the traffic, noises, fumes, and trash receptacles.

■ The fact that a proposed expansion is sizable does not render the expansion unreasonable *per se.* *Domeisen; Whitpain Twp. Bd. of Supervisors v. Whitpain Twp. Zoning Hearing Bd.,* 121 Pa. Cmwlth. 418, 550 A.2d 1355 (1988). Only one third of the 4843–square–foot expansion will occupy the warehouse to be built mainly on the footprint of the existing outbuildings. The remainder of the expansion will occupy the enclosed loading dock and ramp and the area connecting the warehouse to the main building. The evidence establishes that the requested variances represents a reasonable adjustment of the zoning standards necessary to allow a reasonable use of the property without affecting the public health, safety and welfare. *Compare W. Cent. Germantown Neighbors* (concluding that the owner of the nursing home was not entitled to a variance to expand the nonconforming use by 167% because the proposed expansion would destroy gardens and open space protected in the national historic district).[7]

7. The Objectors assert that Applicant sought to increase the nonconforming use by 238%, not 100%, relying on the testimony presented at the remand hearing that the 3369–square–foot outbuildings had been rented for storage.

The Objectors insist that the Board improperly included the outbuildings to find that the existing nonconforming use was 14,436 square feet. Even if Applicant proposed to expand the nonconforming use by 238% as

## IV.

▮ Finally, the Objectors argue that Applicant failed to satisfy the criteria for granting a special exception for the proposed expansion of the nonconforming use.

▮ After review of the relevant provisions of the Ordinance, we conclude that Applicant was required to obtain variances, not a special exception, to expand the nonconforming use beyond the 50% limit in Section 1323.04(a) of the Ordinance. Under the statutory construction rules, all sections of a statute must be construed together in conjunction with each other and in reference to the entire statute. *W. Penn Allegheny Health Sys. v. Med. Care Availability & Reduction of Error Fund (MCARE)*, 11 A.3d 598 (Pa. Cmwlth.2010), *aff'd*, 611 Pa. 200, 23 A.3d 1052 (2011).[8] Section 1323.04(a) of the Ordinance allows an expansion of a nonconforming use only up to 50%. Section 1323.04(b) then requires special exception approval for an expansion, "except that a one-time expansion of up to 5 percent of the nonconforming first floor building footprint in existence as of the adoption date

of this ordinance shall be permitted by right." The Ordinance defines a "special exception use" as "a use in one (1) or more districts for which the Zoning Hearing Board may grant a permit, pursuant to the provisions of the Zoning Ordinance," and a variance as "[a] modification of the regulations of this Ordinance, granted on grounds of exceptional difficulties or unnecessary hardship, not self-inflicted." Sections 1302.90 and 1302.105. When these provisions are construed together, it is apparent that the Ordinance allows an expansion of a nonconforming use by up to 5% by right and by up to 50% by a special exception and disallows an expansion beyond the 50% limit. The former owners already obtained special exceptions to expand the nonconforming use by 50% pursuant to Section 1323.04(b). In order to modify the zoning regulations and further expand the nonconforming use, Applicant was required to obtain variances. Hence, it was unnecessary for the trial court to remand to Board to determine the applicability of the special exception requirement after affirming the Board's grant of variances.[9]

---

the Objectors assert, the proposed expansion still satisfied the criteria for granting a variance and was justified under the doctrine of natural expansion.

8. The statutory construction rules equally apply in interpreting ordinances. *In re Holtz*, 8 A.3d 374 (Pa.Cmwlth.2010).

9. Even assuming, *arguendo*, that a special exception was required for the expansion, the record supports Applicant's entitlement to such relief. A use permitted by a special exception is a use which the municipal legislative body has determined to be appropriate in a zoning district, if specific requirements of the zoning ordinance are met. *Mehring v. Zoning Hearing Bd. of Manchester Twp.*, 762 A.2d 1137 (Pa.Cmwlth.2000). To establish entitlement to a special exception, the applicant must initially prove compliance with the specific, objective criteria of the zoning ordinance. *Bray v. Zoning Bd. of Adjustment*, 48

Pa.Cmwlth. 523, 410 A.2d 909 (1980). The burden then shifts to objectors to establish a high degree of probability that the proposed use will substantially affect the health, safety and welfare of the community greater than what is normally expected from that type of use. *Sunnyside Up Corp. v. City of Lancaster Zoning Hearing Bd.*, 739 A.2d 644 (Pa. Cmwlth.1999). Applicant met all the specific and general criteria required for a special exception. The proposed expansion complies with the setback requirements, and the Board granted a variance from the building coverage limitation. The current use of Applicant's property is also consistent with the City's 2008 comprehensive plan which identifies Applicant's property as "[r]etail and other commercial." R.R. at 522a. As we have already concluded, the proposed expansion will not adversely impact the adjacent properties or be detrimental to the public health, safety and welfare. Moreover, the Board imposed 10

Accordingly, the trial court's orders are affirmed.

**ORDER**

AND NOW, this 7th day of June, 2013, the orders of the Court of Common Pleas of Northampton County in the above-captioned matter are AFFIRMED.

conditions to address the Objectors' concerns over the traffic, noises, fumes and trash col-

lections.